RAILWAY EXPRESS AGENCY, INC., AGENT FOR BLUE STOCK FUR
· RANCH *v.* UNITED STATES

**No. 4679.**—Invoice dated Quebec, Canada, October 15, 1936.
Certified December 16, 1936.
Entered at Rouses Point, N. Y., December 17, 1936.
Entry No. A–2237.

(Decided November 10, 1939)

*William Whynman* for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*William J. Vitale*, special attorney), for the defendant.

EVANS, Judge: This is an appeal from the finding of value made by the appraiser of merchandise at the port of Rouses Point, N. Y.,

upon an importation of 81 live mink from Canada. Only 80 animals are involved in this case, one having been a replacement on an earlier order. The importer entered at a value of $40 each, which value was advanced to $58 each by the appraiser. The importer's attorney states in his brief that the entry was made at the foreign value, while the appraisement was made at export value. We have been unable to find in the record any corroboration for these statements as to the particular statutory value of either the entry or appraisement. However, the record indicates that the export value was no higher than the foreign-market value as those values are defined in section 402 (c) and (d) of the Tariff Act of 1930.

Plaintiff produced the testimony of two witnesses, Mr. Louis T. Later, an officer of the Blue Stock Fur Ranch, the real party in interest herein, and Mr. Joseph Caspe, who does all the experimental work on the Blue Stock Fur Ranch and takes charge of the breeding and selecting of the mink. There were also produced in evidence by the plaintiff four letters by Canadian ranchers offering live mink for export to the United States, being Collective Exhibit 1; Exhibit 2, the affidavit of the exporter, Dr. Joseph E. La Forest; Exhibit 3, an affidavit of an exporter of similar mink; and Exhibit 4, an affidavit of the Director of Service of Fur Animal Breeding of the Province of Quebec, Canada. The Government introduced and there was received in evidence as Exhibit 5 a report of the United States Treasury representative at Montreal, Canada.

At the close of the case on the part of the plaintiff the Government attorney moved to dismiss the appeal to reappraisement upon the ground that the plaintiff had failed to comply with the requirements of the Tariff Act of 1930 (sections 481, 482, 485, and 501). In short, the Government claims that the invoice does not disclose the facts deemed necessary to a proper appraisement, examination, and classification of the merchandise. In this connection we note that article 277 of the Customs Regulations of 1931 provides that collectors will reject certified invoices which are not made in accordance with the regulations. It is presumed that the collector did his duty in the instant case, and followed the regulations. As he did not reject the invoice the presumption is that he found sufficient information thereon to comply with the statute and the regulations thereunder. The motion to dismiss is therefore denied.

On the merits we find the evidence conflicting. It appears, however, that there is no principal market in Canada for mink; that each ranch is its own market. On the question of the usual wholesale quantity the witness Caspe testified that it was a trio or more; a trio consisting of one male and two females. In the affidavit of Mr. Beetz (Exhibit 4) the usual wholesale quantity is given as five trios or more. This was corroborated by the affidavit of Mr. Roland

Dallaire (Exhibit 3). We therefore find on the preponderance of the evidence five trios to be the usual wholesale quantity.

From the testimony of Mr. Louis T. Later, an official of the Blue Stock Fur Ranch, it appears that he travelled through the eastern part of the United States and Canada visiting mink ranches. At that time he was in the market for a number of live mink for experimental purposes in connection with the Blue Stock Fur Ranch. This witness states that he had been in the business of raising live mink for breeding purposes, pelt purposes, since 1936 and that prior thereto he had been engaged in mink blending for about 15 years. He defined mink blending as "giving a mink coat or a mink skin in color what nature didn't." In the course of his travels to the different ranches in search of mink to suit his purpose he finally arrived at the ranch of Dr. La Forest, the exporter herein, in October 1936, and after looking over his mink, agreed to purchase the 80 animals here involved at a price of $40 per animal. As he was not prepared to take care of these mink at that time he arranged with the exporter for him to pay the duty, expressage, feed, care, handling, making of crates in which to ship the animals, the trucking, labor, etc., for the sum of $25 per animal, delivery to be made in the latter part of December, 1936, or the early part of January, 1937. This witness stated that the mink which he bought at that time were kits, that is, young mink under 10 months old which had not yet been through their first mating season. Kits are less valuable than proven breeders, which are animals that have gone through their first mating season and successfully whelped and raised their young.

This witness also stated that prior to making this purchase he had made inquiries as to the market value of animals of a similar type and that it was his opinion that the price he paid, viz, $40, was a fair average price, although some were worth a little more, some a little less than that figure. It further appeared from his testimony that this was an outright purchase; that at the time he made the agreement with Mr. La Forest he paid $500 as a down payment and that upon delivery he paid $4,700.

Dr. Caspe, who stated that he is in the mink-blending business and mink-ranching business, testified that he does all the experimental work on the ranch of the importer herein and takes charge of the breeding and selecting, etc., and conducts research work in connection with the actual production of the color work on the mink pelts after they are made up into garments. This witness testified that he keeps in touch with the market conditions of the live animals, making trips to Canada frequently. He saw the mink the subject of this suit upon their arrival at Woodstock, N. Y., where the importer's ranch is located, and stated that they were all kits, but not of the best quality;

they were a medium grade. The witness also stated that $40 was an extremely fair value for this type of animal.

All of the witnesses stated that the market in Canada is lower in December than in October; after the pelting season the price drops.

Collective Exhibit 1, which, as stated above, consisted of four letters by Canadian ranchers offering live mink for export to this country, is of very little assistance to the court in that they quote prices for "female breeders," "breeding minks," "young minks," and "selected pairs." One of the letters states that no charges are made for feeding animals ordered "from time of ordering till September 30th." The animals here involved were not ordered until October.

The affidavit of the exporter (Exhibit 2) is to the effect that on or about October 21, 1936, he sold 80 kits to the importer herein and received the sum of $5,200; that each kit was estimated at $40, and "the balance of the money was for shipment, cartage, expressage, and duty and also for the care of the animals pending delivery." This affiant also states that $40 was a freely offered price to all purchasers at his ranch and that the wholesale price for sale in Canada and to countries outside Canada in the usual wholesale quantities was no higher; that the season for selling live mink commences in October and reaches its height in the early part of November, and that the prices generally drop in December. He enumerates seven sales, only one of which is of any evidentiary value, viz, 90 kits at $40 each shipped to Norway, which were of about the same quality as those here involved. The other sales listed were not in what this affiant stated to be the usual wholesale quantity, viz, five trios.

Exhibit 3, an affidavit of an exporter of similar mink, states that the value of $40 each for the instant merchandise was not below the prevailing wholesale market price for sale in Canada or for export to the United States and other foreign countries. This affiant also stated that he would have been glad to receive for his kits and breeders of about the same or similar quality, condition, and history, $40 each at the date of exportation of these kits, and in fact would have taken less because of the fact that at that time the season is about at an end and the live animals for sale and not sold must be pelted.

Exhibit 4, an affidavit of Mr. Johan Beetz, corroborated the above as to the value of $40 each for these mink, which he had seen and examined.

The Government offered in evidence and there was received as Exhibit 5 the report of C. L. Orton, Treasury representative, dated Montreal, January 12, 1937. This report states that the special agent or representative secured information from the seller and shipper of these mink, which is verified so far as shown in the report. The report contradicts much of the evidence produced on the part of the plaintiff. It states that the price agreed upon was $58 each and the

records showed that a cash deposit of $500 was made on October 21, 1936, and that the seller received altogether the sum of $5,200. The report also sets forth an itemized statement of the charges, which leaves an amount of $12.11 unaccounted for and unexplained. It is further set forth in said report that the seller stated to the special agent that this shipment consisted of 8 adult male and 14 adult female mink, the remainder being kits. It sets out five sales made by this seller and exporter, some for export to the United States and some sales made in Canada. None of these sales was in what we have determined to be the usual wholesale quantity, some being of one animal, some of two, one of three, and one of five mink.

On the record the court is of the opinion that the preponderance of the evidence supports the claim that the dutiable value of these animals is the export value as defined by the statute, and is $40 each and I so find. Judgment will be rendered accordingly. It is so ordered.